NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| PREMIER PORK L.L.C., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Hon. Joseph H. Rodriguez |
| v. | : | |
| | : | Civil Action No. 07-1661 |
| WESTIN, INC., WESTIN PACKAGED | : | |
| MEATS L.L.C., f/k/a COOK COUNTY | : | OPINION |
| COOKERS L.L.C., PREMIUM PROTEIN | : | |
| PRODUCTS L.L.C., ALMA FOODS | : | |
| L.L.C., f/k/a FLINT HILLS FOODS L.L.C., | : | |
| LASALLE NATIONAL BANK, BRETT | : | |
| ELLIOT, BRAD POPPEN, BERNARD | : | |
| HANSEN, & TODD HANSEN, | : | |
| | : | |
| Defendants. | : | |

_____ :

RODRIGUEZ, Senior District Judge:

This matter comes before the Court on two motions: First, Defendant LaSalle

Bank National Association ("LaSalle")[1] moves to dismiss Counts II, IV, V, and VI of the

Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Second, Defendants Westin, Inc., Westin Packaged Meats, Inc. ("WPM"),[2] Brett Elliot

---

[1] LaSalle was incorrectly identified in the Amended Complaint as LaSalle National Bank.

[2] WPM was incorrectly identified in the Amended Complaint as a limited liability company, rather than as a corporation.

("Elliot"), and Brad Poppen ("Poppen")[3] move to dismiss all counts of the Amended

Complaint under Federal Rule 12(b)(6).  For the reasons stated below, the Court will

grant LaSalle's motion.  Additionally, it will grant in part and deny in part the Westin

Defendants' motion.

## I.  BACKGROUND

Plaintiff in this case is Premier Pork ("Plaintiff").  It is a New Jersey limited

liability company that is in the business of supplying various clients with pork bellies.  It

is also a creditor of an insolvent company.  It is suing various individuals and entities in

order to obtain compensation for pork bellies it sold to that company.

There are several defendants in this action and their relationship with one another

is somewhat convoluted.  Cook County Cookers ("CCC") is a now-defunct Illinois

limited liability company that purchased pork bellies from Plaintiff and had its assets

foreclosed upon by its senior secured creditor without ever having paid Plaintiff for the

bellies it purchased.  CCC was allegedly owned by a Kansas-based limited liability

company known as Flint Hills Foods.[4]  Premium Protein Products is a Nebraska limited

liability company, which is allegedly majority owned by Flint Hills Foods.  WPM is a

Nebraska corporation, and is allegedly CCC's successor in interest.  Westin, Inc., also a

---

[3]The Court will frequently refer to Westin, Inc., WPM, Elliot, and Poppen collectively as
the "Westin Defendants."

[4]Flint Hills Foods apparently changed its name recently to Alma Foods.  The Court will
nonetheless refer to this entity as "Flint Hill Foods."

2

Nebraska corporation, is the corporate parent of WPM.  LaSalle is an Illinois corporation and was CCC's senior secured creditor.  Brad Poppen is a domiciliary of Nebraska who allegedly served as the chief financial officer of CCC and now serves in the same position for Westin, Inc.  He is also allegedly a "contractor" for WPM, although there is no further allegation concerning what exactly this means.  Brett Elliot is a domiciliary of Kansas.  He was the president of CCC and is now the president of a non-party company called Anytime Foods, which is allegedly a joint venture between Westin, Inc. and Flint Hills Foods.  Elliot is also, in some unspecified fashion, an employee of Westin, Inc. (See Westin Br., p. 5.)  Bernard Hansen and Todd Hansen are domiciled in Nebraska and Kansas, respectively.  The Amended Complaint is ambiguous regarding who these individuals are in relation to the other defendants.  Ultimately, however, this ambiguity is unimportant to the disposition of the instant motions.

The substance of Plaintiff's factual allegations can be succinctly reduced to the following brief summary: Plaintiff alleges that CCC and its senior creditor, LaSalle, entered into a "friendly foreclosure"[5] that resulted in LaSalle holding a fraudulent auction of CCC's assets.  (See, e.g., Am. Compl., ¶¶ 5, 23.)  The winning bid at the auction came from Flint Hills Foods, which, again, was CCC's parent company.  (Id., ¶¶ 6, 26.)  Thereafter, Flint Hills Foods sold its newly-acquired assets to WPM, which was allegedly

_____

[5]The Amended Complaint does not explain what Plaintiff means when it uses the phrase "friendly foreclosure."  This phrase appears to have been borrowed from a news article about the defendants' various dealings with one another.  (See Am. Compl., Exh. A.)

3

incorporated by its parent, Westin, Inc., for the specific purpose of buying CCC's assets from Flint Hills Foods and moving them to a facility in Nebraska owned by Premium Protein Products.  (Id., ¶ 27.)  Importantly, Premium Protein Products is allegedly "majority controlled" by Flint Hills Foods, which, according to Plaintiff, has been linked to Westin, Inc. through a "series of convoluted deals for over a year."  (Id., ¶ 11.)  Thus, the wrong about which Plaintiff complains is that the parties' dealings permitted Flint Hills Foods, and its partner, Westin, Inc., to essentially shield CCC's assets from its creditors.

Because Plaintiff was one of those creditors, it initiated this action on April 9, 2007.  Subject matter jurisdiction is premised on both the presence of a federal question and the complete diversity of the parties' citizenship.  (See id., ¶¶ 1, 2.)  On July 30, 2007, Plaintiff filed an Amended Complaint in which it asserts causes of action against all defendants, except LaSalle, for breach of contract (Count I) and fraudulent misrepresentation (Count III) relating to statements allegedly made about the payment of CCC's debt to Plaintiff.  Additionally, Plaintiff asserts causes of action against all defendants, including LaSalle, for two violations of the Packers and Stockyards Act ("PSA" or the "Act"), 7 U.S.C. § 181, et seq. (Count II), fraud related to the so-called "friendly foreclosure" (Count IV), unjust enrichment (Count V), and civil conspiracy (Count VI).

LaSalle now moves to dismiss Counts II, IV, V, and VI of the Amended Complaint

4

for failure to state a claim.  Likewise, the Westin Defendants move to dismiss the

Amended Complaint in its entirety for the same reason.[6]  The Court will analyze both

motions together.

## II.  DISCUSSION

### A.  Standard on a Motion to Dismiss Under Rule 12(b)(6)

A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts,

taken as true, fail to state a claim.  Fed. R. Civ. P. 12(b)(6); see In re Warfarin Sodium,

214 F.3d 395, 397-98 (3d Cir. 2000).  "While a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of a cause of action's elements will not do."  Bell

Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are

"enough to raise a right to relief above the speculative level on the assumption that all of

---

[6]In moving to dismiss the Amended Complaint, the Westin Defendants attached a certification that potentially required the Court to convert their motion to dismiss to one for summary judgment.  See Fed. R. Civ. P. 12(d).  However, this certification is referenced in the Westin Defendants' moving papers only in the course of attacking Plaintiff's unjust enrichment claim.  As discussed in section II.B.4., *infra*, of this Opinion, the Court will dismiss this claim because of a variety of pleading defects, all of which are unrelated to the issues raised in the certification.  Thus, the Court finds it unnecessary to refer to the certification and, by extension, unnecessary to convert the Westin Defendants' motion to dismiss.  See Trans Hudson Express, Inc. v. Nova Bus Co., Civil No. 06-4092, 2007 U.S. Dist. LEXIS 26724, at *1 n.1 (D.N.J. Apr. 10, 2007) (declining to convert a motion filed pursuant to Rule 12(b)(6) to a motion for summary judgment notwithstanding the parties' submission of affidavits because conversion was unnecessary).

the complaint's allegations are true (even if doubtful in fact)." Id. at 1965 (internal

citations omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), only the allegations

in the complaint, matters of public record, orders, and exhibits attached to the complaint,

are taken into consideration. Chester County Intermediate Unit v. Pa. Blue Shield, 896

F.2d 808, 812 (3d Cir. 1990). A district court must accept as true all allegations in the

complaint and all reasonable inferences that can be drawn therefrom. See Oshiver v.

Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). Moreover, these

allegations and inferences must be viewed in the light most favorable to the plaintiff. Id.

However, a court need not accept "'unsupported conclusions and unwarranted

inferences,'" Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted),

and "[l]egal conclusions made in the guise of factual allegations . . . are given no

presumption of truthfulness," Wyeth v. Ranbaxy Labs., Ltd., 448 F. Supp. 2d 607, 609

(D.N.J. 2006) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)); see also Kanter v.

Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 351

(3d Cir. 2005)) ("[A] court need not credit either 'bald assertions' or 'legal conclusions'

in a complaint when deciding a motion to dismiss.").

It is not necessary for the plaintiff to plead evidence. Bogosian v. Gulf Oil Corp.,

561 F.2d 434, 446 (3d Cir. 1977). The question before the court is not whether the

plaintiff will ultimately prevail. Watson v. Abington Twp., 478 F.3d 144, 150 (2007).

Instead, the court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974.

### B.  Analysis

#### 1.  Count I: Breach of Contract

In Count I, Plaintiff alleges that CCC breached its sales agreement contracts when it failed to pay for the pork bellies it purchased.  It attempts to hold all defendants, except LaSalle, liable for this breach "because of their disregard of corporate entities."  (Am. Compl., ¶ 35.)  The Westin Defendants contend that Count I must be dismissed because Plaintiff does not sufficiently allege that WPM is the successor in interest to CCC.  As such, neither WPM, nor any other Westin Defendant, can be held liable for CCC's breaches of contract.  The Court, however, finds that Plaintiff's breach of contract claim is properly pled, though only as to WPM and not the other Westin Defendants.

##### a.  Allegations Regarding WPM's Liability for CCC's Breach of Contract

In order to properly plead a claim for a breach of contract, a plaintiff must allege "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties."  Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002).  A claim for a breach of contract is subject to the liberal notice pleading requirements found in Rule 8(a) of the Federal Rules of Civil Procedure.[7]  See, e.g., St.-Val v. Domino's Pizza, LLC, Civil No.

---

[7]Rule 8(a) provides, in relevant part: "A pleading that states a claim for relief must contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to

06-4273, 2007 U.S. Dist. LEXIS 50518, at *4-5 (D.N.J. July 12, 2007) (applying Rule 8(a) to a plaintiff's breach of contract claim).

In interpreting Rule 8, the Supreme Court has previously indicated that it does not demand fact pleading nor that a plaintiff's legal theories be set out in particularity. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002), *abrogated in part by* Twombly, 127 S. Ct. at 1968-69.  Even in the more recent case of Twombly, the Court reiterated that Rule 8(a) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  127 S. Ct. at 1973-74.  Ultimately, Rule 8 is satisfied where the complaint provides a "statement sufficient to put the opposing party on notice of the claim."  Weston v. Pennsylvania, 251 F.3d 420, 428 (3d Cir. 2001) (citations omitted).

In this case, Plaintiff has sufficiently alleged a breach of contract by CCC.  It plausibly claims that: (1) contracts existed between it and CCC, (Am. Compl., ¶ 31,); (2) it performed under those contracts by supplying CCC with pork bellies, (see id.,¶ 33,); (3) CCC failed to pay for the pork bellies it received, thereby breaching those contracts, (id., ¶ 32,); and (4) it suffered resulting damages to the extent of CCC's failure to pay, (see id., ¶¶ 32, 34.)

The Westin Defendants do not challenge the sufficiency of these allegations. Instead, they argue that Plaintiff has not adequately alleged that WPM is CCC's successor

relief . . . ."

in interest and, as such, WPM cannot be held liable for CCC's breaches. This assertion is contradicted, however, by the Amended Complaint, which clearly alleges that WPM is CCC's successor. (Am. Compl., ¶¶ 4, 11, 15.) Other courts have recognized that a plaintiff's claim of successorship liability is satisfied by general allegations of successorship. See, e.g., Napolitano v. BAE Sys. N. Am., 2005 U.S. Dist. LEXIS 45272, at *8, 10 (D.N.J. July 20, 2005) (holding that a plaintiff stated a claim for breach of contract on a successor liability theory where the complaint alleged the elements necessary for a breach of contract and further alleged that the defendant was liable for the breach as a successor in interest); Sealy Conn., Inc. v. Litton Indus., Inc., 989 F. Supp. 120, 122-23 (D. Conn. 1997) (holding that a successor liability claim will be adequately pled even when only a bare allegation is made that the defendant is a successor in interest); see also Kuhns Bros. v. Fushi Int'l, Inc., Civil No. 06-1917, 2007 U.S. Dist. LEXIS 51461, at *14-15 (D. Conn. July 16, 2007) (reaffirming the approach taken in the Sealy Connecticut case even after the Supreme Court's decision in Twombly, 125 S. Ct. 1955, was handed down). The Westin Defendants cite no authority suggesting that more factual specificity is required under Rule 8(a). Thus, the Court is satisfied that Plaintiff has sufficiently pled its breach of contract claim and its related theory that WPM is CCC's successor in interest.

Moreover, even if Plaintiff had an obligation to plead particular facts supporting its successor liability theory, the Court is satisfied that it has done so in this case. The

general rule of successorship liability is really one of nonliability.[8]  Most jurisdictions

adhere to the doctrine that a company which purchases the assets of another company will

not ordinarily be held liable for the debts of the seller.  Vernon v. Schuster, 688 N.E.2d

1172, 1175 (Ill. 1997); Ramirez v. Amsted Indus., Inc., 431 A.2d 811, 815 (N.J. 1981).

This rule "'developed as a response to the need to protect bonafide purchasers from

unassumed liability' and was 'designed to maximize the fluidity of corporate assets.'"

Vernon, 688 N.E.2d at 1175 (citations omitted).

There are four widely recognized exceptions to the general rule, however: (1)

where there is an express or implied agreement that the buyer will assume the liabilities of

the seller; (2) where the transaction amounts to a consolidation or merger of the buyer and

seller; (3) where the buyer is merely a continuation of the seller; or (4) where the

transaction is for the fraudulent purpose of escaping liability for the seller's obligations.

Id. at 1175-76; Ramirez, 431 A.2d at 815.  In the few cases where courts have reviewed

---

[8]The Westin Defendants argue that Illinois law should govern the question of whether
WPM is a successor to CCC.  (Westin Br., pp. 13-15.)  "Before a choice of law question arises,
however, there must actually be a conflict between the potentially applicable bodies of law."
Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994).  "Where there is no difference
between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict'
and the court need not decide the choice of law issue."  Id.  Instead, the court should resolve the
matter before it by reference to each state's law.  Id.

In this case, the Westin Defendants do not identify any differences between the laws of
Illinois and New Jersey concerning successorship liability.  Indeed, both states adhere to the same
general rule of nonliability and the same limited exceptions, with one difference that is irrelevant
to this case.  For the purposes of evaluating the sufficiency of the Amended Complaint, it
therefore appears that there is no actual conflict that requires a choice of law analysis.
Accordingly, the Court will refer to both states' law in this Opinion, but will permit the parties to
revisit the issue in the future should they decide to do so.

the factual allegations upon which successor liability is premised, they have done so under the liberal notice pleading standards of Rule 8(a), even where a plaintiff bases its successorship claim on a fraudulent transfer theory.  See, e.g., Adani Exps. Ltd. v. AMCI (Export) Corp., Civil No. 05-0304, 2006 U.S. Dist. LEXIS 42986, at *3-4 (W.D. Pa. June 26, 2006).

In this case, Plaintiff has alleged enough facts to support its successorship theory. It claims that CCC, through LaSalle's foreclosure, sold its assets to its own parent company, Flint Hills Foods.  (See Am. Compl., ¶¶ 5, 6, 23, 26.)  In turn, Flint Hills Foods allegedly sold those assets to WPM so that WPM could move those assets to a facility run by Premium Protein Products, (id., ¶ 27,) which is controlled by Flint Hills Foods, (id., ¶ 11.)  Taking these allegations as true and viewing them in the light most favorable to Plaintiff, it is plausible that WPM is CCC's successor in interest under at least the fraudulent transfer exception to the general rule of nonliability.

It is possible that facts gleaned through discovery and revealed at the summary judgment stage of this litigation may support the Westin Defendants' contention that WPM is not CCC's successor.  Until that time, the Court concludes that Plaintiff may maintain its action for breach of contract against WPM.  As discussed in the paragraphs that follow, however, the remaining Westin Defendants require a different approach.

### b.  Allegations Regarding the Other Westin
### Defendants' Liability:  Piercing WPM's Corporate Veil

Having determined that Plaintiff can maintain its breach of contract claim against WPM, there remains the additional question of which of the other Westin Defendants, if any, can also be held liable under Count I.  Plaintiff asserts that "all of the Defendants (except LaSalle Bank) are liable for this breach of contract because of their disregard of corporate entities."  (Am. Compl., ¶ 35; see id., ¶¶ 8, 10.)  Presumably, Plaintiff is attempting to pierce WPM's corporate veil in order to hold its parent, Westin, Inc., and its parent's employees, Brad Poppen and Brett Elliot, liable for this breach.  For the reasons discussed below, however, these allegations fail to state a claim.

It is a fundamental proposition under New Jersey law[9] that a corporation is a separate entity from its corporate principals.  State of New Jersey, Dep't of Environmental Protection v. Ventron Corp., 468 A.2d 150, 164 (N.J. 1983).  Indeed, "a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise."  Id.  Thus, limited liability will normally not be abrogated, even in the case of a parent corporation and its wholly-owned subsidiary.  Id.

Notwithstanding the general rule of limited liability, "courts may pierce the corporate veil by finding that a subsidiary was 'a mere instrumentality of the parent

_____

[9]In challenging the sufficiency of the pleadings with respect to piercing the corporate veil, the Westin Defendants cite to New Jersey law thereby indicating that New Jersey law should govern this question.  (See Westin Br., p. 24 & n.6.)  Plaintiff seemingly agrees.  (See Pl. Res. Br. to Westin's M., pp. 11-12.)

corporation.'" Id. (citations omitted).  In order to state a claim for piercing the corporate

veil, a complaint must contain factual assertions showing that: "(1) the parent corporation

'so dominated the subsidiary that it had no separate existence but was merely a conduit

for the parent,' and (2) 'the parent has abused the privilege of incorporation by using the

subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.'"[10] Ohai

v. Verizon Commc'ns, Inc., Civil No. 05-0729, 2005 U.S. Dist. LEXIS 25703, at *23-24

(D.N.J. Oct. 28, 2005) (quoting Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145,

149 (3d Cir.1988) (in turn quoting Ventron, 468 A.2d at 164)); see Bd. of Tr. of

Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002)  .

        "To display the requisite 'control' over a subsidiary necessary to pierce the

corporate veil, a corporate parent must have more than mere majority or complete stock

control." Ohai, 2005 U.S. Dist. LEXIS, at *24 (citing Craig, 843 F.2d at 150); see also

Ventron, 468 A.2d at 164.  Instead, the parent must "completely dominate the finances,

policy, and business practice with respect to the subject transaction." Id. (citing Craig,

_____

        [10]This framework also applies to natural persons because "'[p]arent' corporations . . . are
not the only parties liable under a veil piercing theory.  Shareholders have also been found liable
when they have totally dominated the corporation, failed to maintain the corporate identity, and
used the corporation to perpetrate fraud, injustice or some other illegality." Bd. of Tr. of
Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n.9 (3d Cir. 2002)
(citations omitted).  Likewise, corporate officers are also potentially liable under a veil piercing
theory where evidence is presented that shows the corporation was a "sham," and existed only so
that the officers could avoid personal liability.  See N. J. Dep't of Env't Prot. v. Gloucester Env't
Mgmt. Servs., Inc., 800 F. Supp. 1210, 1219-20 & n.9 (D.N.J. 1992).

843 F.2d at 150).  In other words, the subsidiary must have "no separate mind, will, or existence of its own."  <u>Craig</u>, 842 F.2d at 150 (citation omitted).  Factors relevant to this inquiry include:

> gross undercapitalization . . . "failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

<u>Id.</u> (quoting <u>Am. Bell, Inc. v. Fed'n of Tel. Workers</u>, 736 F.2d 879, 886 (3d Cir. 1984)).

Significantly, a parent's domination or control of its subsidiary cannot be established by the mere fact that the corporations' boards of directors or officers overlap.  <u>Seltzer v. I.C. Optics, Ltd.</u>, 339 F. Supp. 2d 601, 610 (D.N.J. 2004); <u>see</u> <u>United States v. Bestfoods</u>, 524 U.S. 51, 69, (1998) ("It is a well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership.")

The Third Circuit recently evaluated the sufficiency of a plaintiff's dominance allegations in <u>Foodtown</u>, 296 F.3d 164.  In that case, the plaintiff claimed that

> defendants failed to maintain formal barriers between the management structures of [two corporate entities]; failed to maintain formal barriers between [these entities] for purposes of legal representation; commingled funds and other assets; and failed to observe other corporate formalities.  Furthermore, [the plaintiff] contends that [these entities] shared twelve of thirteen common directors and that at all times [the subservient entity's] Board of Directors was dominated and controlled by the

14

> [dominant entity]-affiliated Directors.   [The plaintiff] also
> claims that all of [the dominant entity's] shareholder/members
> were also members of [the subservient entity] and that all the
> corporate defendants were common shareholder/members of
> [both entities]. [The plaintiff] also claims that [both entities]
> shared the same principal office and registered office.

Id. at 172 (internal citations omitted).  Viewed as true, the Court of Appeals found that these allegations supported the first prong of the veil piercing test, i.e., complete dominance.  See id.

This Court reached a different result in Ohai, 2005 U.S. Dist. LEXIS 25703. There, the complaint did not sufficiently support the complete dominance prong because the only allegation pertaining to the dominance of the subsidiary by the parent corporations related to the parents' 55% and 45% stakes in the subsidiary.  Id. at *26. Critically, neither the complaint nor the plaintiff's opposition papers contained any claims that the parent companies influenced the subsidiary's finances, policy, or business practice related to the relevant transaction.  Id. at *26-27.  The Court therefore held that the veil piercing allegations failed to state a claim.  Id. at *28.

In opposing the instant motion, Plaintiff argues that "the entire Amended Complaint and [the news paper article attached thereto] is replete with detailed explanations of the corporate and Individual Defendants' disregard of the corporate entities."  (Pl. Res. Br. to Westin M., p. 10.)  For example, Plaintiff alleges that WPM is a subsidiary of Westin, Inc.  (See Am. Compl., ¶ 27.)  Likewise, it claims that Brad Poppen was the chief financial officer of both CCC and Westin, Inc., as well as a "contractor" for

15

WPM.  (Id., ¶ 11.)  The Amended Complaint further alleges that Brett Elliot has a controlling interest in Flint Hills Foods, and was the president of both CCC and Anytime Foods, which is a joint venture between Flint Hills Foods and Westin, Inc.  (Id., ¶ 27 n.2.)  Under cases like Ventron and Seltzer, however, these allegations are insufficient because the corporate form will normally be maintained even in the case of 100% ownership and notwithstanding an overlap in directors or officers.

As in Ohai, the critical allegations that are missing from the Amended Complaint in this case are those from which the Court could reasonably infer complete dominance of WPM by Westin, Inc, Poppen, or Elliot.  For example, there are no allegations addressing whether and to what extent any defendant influenced the finances, policy, and business practice of WPM in relation to its acquisition of CCC's assets.  Additionally, unlike in Foodtown, Plaintiff makes no allegations concerning which, if any, corporate formalities were disregarded.

Because the Amended Complaint is totally devoid of allegations relating to the dominance of WPM, Plaintiff has failed to raise his right to pierce that company's corporate veil above the speculative level.  See Twombly, 127 S. Ct. at 1965.  Accordingly, Westin, Inc., Brett Elliot, and Brad Poppen cannot be held liable for any breach of contract attributed to WPM as the possible successor in interest to CCC.[11]

---

[11]Plaintiff similarly fails to state a claim for piercing the corporate veil to the extent that it attempts to do so in relation to any other cause of action asserted in the Amended Complaint.

2.  Count II:  The Packers and Stockyards Act

In Count II, Plaintiff asserts two claims based on the PSA.  First, it contends that it is entitled to participate in the statutory trust created by section 206 of the Act, under which proceeds for certain cash sales must be held in trust for unpaid sellers.  (Am. Compl., ¶ 37.)  In essence, Plaintiff claims that, as an alleged trust beneficiary, it has priority over LaSalle for CCC's liquidated assets and can hold the Westin Defendants[12] liable for CCC's failure to maintain those assets in the trust.  Second, Plaintiff alleges that LaSalle and the Westin Defendants engaged in an "unfair practice" made unlawful by section 202 of the Act insomuch as they delayed payment for the pork bellies Plaintiff delivered.  (Id., ¶ 41.)  Notwithstanding these allegations, however, Plaintiff's PSA claims fail as a matter of law because the transactions at issue in this case involved pork bellies and not "livestock."

Among other reasons, the PSA was enacted to assure fair trade practices in the livestock marketing and meat-packing industries, thereby safeguarding farmers and ranchers against receiving less than the true market value of their livestock.  Bruhn's Freezer Meats, Inc. v. United States Dep't of Agric., 438 F.2d 1332, 1337 (8th Cir. 1971).

---

[12]Plaintiff alleges that all of the Westin Defendants are liable for its PSA claims, although it does not specify whether this liability is premised on a corporate veil piercing theory or some other theory.  Ultimately, however, this omission is unimportant because Plaintiff's PSA claims fail as a matter of law against all defendants.

17

To this end, the Act provides several sources of protection for sellers of livestock.[13]  For

example, section 206(b) of the Act creates a statutory trust for the benefit of livestock

sellers and provides, in relevant part:

> All livestock purchased by a packer in cash sales, and all
> inventories of, or receivables or proceeds from meat, meat food
> products, or livestock products derived therefrom, shall be held
> by such packer in trust for the benefit of all unpaid cash sellers
> of such livestock until full payment has been received by such
> unpaid sellers[.]

7 U.S.C. § 196(b).  This provision has been interpreted as granting trust beneficiaries

priority over lenders who are given security interests in inventories or receivables that are

subject to the trust.  See, e.g., First State Bank of Miami v. Gotham Provision Co., Inc. (In

re Gotham Provision Co.), 669 F.2d 1000, 1010 (5th Cir. 1982).

Under section 206, an entity will be a trust beneficiary only if it is an "unpaid cash

seller[] of . . . livestock . . . ."  7 U.S.C. § 196(b); see Gotham Provision, 669 F.2d at 1004

(stating that Congress limited the applicability of the PSA's trust provision to transactions

in which the commodities sold are "livestock"); Hedrick v. S. Bonaccurso & Sons, Inc.,

466 F. Supp. 1025, 1030 (E.D. Pa. 1978) ("In 1976, the Act was amended to specifically

create a statutory trust for the benefit of the unpaid cash seller of livestock delivered and

proceeds therefrom until the packer pays for his purchases.").  The Act defines

"livestock" as "cattle, sheep, swine, horses, mules, or goats whether live or dead."  7

---

[13]The Act also creates several protections for sellers of poultry.  See 7 U.S.C. §§ 192,
197.  However, these protections are not at issue in this case and will therefore not be discussed
in any detail.

U.S.C. § 182(4).  Thus, a plaintiff must sufficiently allege that it is an unpaid seller of cattle, sheep, swine, horses, mules, or goats if it is "to raise a right to relief above the speculative level . . . ."  See Twombly, 127 S. Ct. at 1965.  In this case, however, the transactions at issue involved the sale of pork bellies.  (See Am. Compl., ¶¶ 15, 33, 38.)

Plaintiff does not claim that pork bellies constitute livestock; instead, it concedes that pork bellies are "meat food products," (see Pl. Res. Br. to LaSalle M., pp. 3-4,) which are defined by the PSA as "all products and by-products of the slaughtering and meat-packing industry if edible," 7 U.S.C. § 182(3).  Notwithstanding cases like Gotham Provision and Hedrick, Plaintiff contends that PSA trust benefits unpaid sellers of meat and meat food products to the same extent that it benefits unpaid sellers of livestock. (See Pl. Res. Br. to LaSalle M., pp. 3-4.)  However, it bases its argument on an erroneous construction of selectively quoted statutory text.

To support its position, Plaintiff quotes the following portion of section 206: "All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from *meat, meat food products* . . . shall be held in trust . . . ."  (Id., p. 3 (emphasis and omissions in original).)  The problem with Plaintiff's argument is manifest upon examining the statutory language it omitted.  Again, section 206 provides:

> All *livestock* purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products *derived therefrom*, shall be held by such packer in trust for the benefit of all *unpaid cash sellers of such livestock* until full payment has been received by such unpaid sellers[.]

19

7 U.S.C. § 196(b) (emphasis added).  The full statutory language and the previously cited cases interpreting it make clear that the trust protects only unpaid cash sellers of livestock. Meat and meat food products are relevant only insomuch as the property to be held in trust includes "all inventories of, or receivables or proceeds from meat[ or] meat food products" that are "derived" from the livestock initially sold to the packer by the "unpaid cash sellers of such livestock."  See id.; see also Gotham Provision, 669 F.2d at 1011 (indicating that inventories and receivables of meat products are subject to the trust if they are derived from livestock sold by an unpaid cash seller).  Thus, because Plaintiff concedes that the relevant transactions involved only the sale of meat food products and not livestock, the Court concludes that Plaintiff is not entitled to participate in the statutory trust.[14]

Plaintiff's unfair practice claim fails for the same reason.  Section 202 of the Act prohibits certain enumerated practices and provides, in relevant part:

> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:  (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device . . . .

7 U.S.C. § 192.  In turn, section 409 of the Act, which deals with payment for the purchase of livestock, specifically declares:

---

[14]LaSalle and the Westin Defendants also argue that Plaintiff's statutory trust claim is defective because Plaintiff did not plead that it complied with certain notice requirements found is section 206.  However, because the Court has determined that Plaintiff is not a trust beneficiary in the first place, there is no need to address this argument.

> Any delay or attempt to delay by a market agency, dealer, or packer *purchasing livestock*, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment *for such livestock* shall be considered an "unfair practice" in violation of this Act.

7 U.S.C. § 228b(c) (emphasis added).

In this case, Plaintiff alleges that "Defendants are also liable under the Act because they engaged in an 'unfair practice' . . . in an effort to delay making payments to [Plaintiff]." (Am. Compl., ¶ 41.)  In opposing the instant motions to dismiss, Plaintiff confirms that this claim is premised on section 409 of the Act.  (See Pl. Res. Br. to. LaSalle M., p. 4; Pl. Res. Br. to Westin M., pp. 14-15.)  However, the quoted statutory text clearly indicates that section 409 applies only to transactions involving the sale of livestock.  Because Plaintiff concedes that it did not sell livestock, any delay in payment it endured cannot be deemed an "unfair practice" as defined in section 409 and prohibited by section 202.

For these reasons, Plaintiff has failed to state a claim under the PSA.  Accordingly, Count II will be dismissed as to LaSalle and all of the Westin Defendants.

### 3.  Counts III and IV: Common Law Fraud

In Count III, Plaintiff asserts that all defendants, except LaSalle, committed common law fraud because Defendant Brett Elliot allegedly misrepresented that Plaintiff would receive payment for the pork bellies it shipped to CCC.  In Count IV, Plaintiff alleges that all defendants, including LaSalle, are liable for common law fraud relating to

21

the so-called "friendly foreclosure."  The Westin Defendants argue that Counts III and IV must be dismissed because Plaintiff has failed to plead its fraud claims with sufficient particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.  LaSalle echoes this argument with respect to Count IV.  For the following reasons, the Court agrees that the pleadings in both counts are inadequate.

The general standard of review triggered by a defendant's motion to dismiss under Rule 12(b)(6) is altered by Rule 9(b).  In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 275 (D.N.J. 2007).  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  In other words, the rule requires plaintiffs to plead with particularity the facts supporting the elements of fraud. See In re Suprema Specialties, Inc. Sec Litig., 438 F.3d 256, 270 (3d Cir. 2006).  The purpose of this heightened standard is to "give defendants 'notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements.'"  Id. (alterations in original) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).

In order to successfully plead fraud under Rule 9(b), plaintiffs must offer "some precision and some measure of substantiation."  Gutman v. Howard Sav. Bank, 748 F. Supp. 254, 257 (D.N.J. 1990).  Plaintiffs may satisfy the rule's requirement "by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision

and some measure of substantiation into their allegations of fraud.'"  Lum v. Bank of

Am., 361 F.3d 217, 224 (3d Cir. 2004) (quoting Seville Indus. Mach. Corp. v. Southmost

Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).  "Plaintiffs also must allege who made a

misrepresentation to whom and the general content of the misrepresentation."  Id.

Pleadings containing collectivized allegations against "defendants" as a group are

insufficient under Rule 9(b).  Naporano Iron & Metal Co. v. American Crane Corp., 79 F.

Supp. 2d 494, 511 (D.N.J. 1999); see Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d

460, 496 (D.N.J. 1998) ("Rule 9(b) is not satisfied where the complaint vaguely attributes

the alleged fraudulent statements to 'defendants.'").  Instead, "[a] plaintiff must plead

fraud with particularity with respect to each defendant, thereby informing each defendant

of the nature of its alleged participation in the fraud."  Naporano, 79 F. Supp. 2d at 511.

Rule 9(b) requires the identification of the elements of a fraud claim.  In re

Craftmatic Sec. Litig., 890 F.2d 628, 645 (3d Cir. 1989).  To state a claim for common

law fraud in New Jersey,[15] a plaintiff must allege: "'(1) a material misrepresentation [or

omission] of a presently existing or past fact; (2) knowledge or belief by the defendant of

its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon

by the other person; and (5) resulting damages.'"  Delaney v. Am. Express Co., Civil No.

---

[15]Both LaSalle and the Westin Defendants indicate that New Jersey law applies in considering their motions to dismiss the fraud claims, (LaSalle Br., p. 8 n.1; Westin Br., p. 22 n.5,) although LaSalle reserves the right to challenge the choice of law "should this case proceed beyond the pleading stage," (LaSalle Br., p. 8 n.1.)  Plaintiff seemingly agrees as to the applicability of New Jersey law.  (See Pl. Res. Br. to LaSalle M., p. 5; Pl. Res. Br. to Westin M., pp. 5-7.)

06-5134, 2007 U.S. Dist. LEXIS 34699, at *17 (D.N.J. May 11, 2007) (alteration in

original) (quoting Wartsila NSD N. Am., Inc. v. Hill Intern., Inc., 342 F. Supp. 2d 267,

287-88 (D.N.J. 2004)).

Importantly, "Rule 9(b) also requires that the detrimental reliance element of a

fraud claim be pleaded with particularity." Gutman v. Howard Sav. Bank, 748 F. Supp.

254, 257 (D.N.J. 1990) (citing Learning Works, Inc. v. Learning Annex, Inc., 830 F.2d

541, 546 (4th 1987)).  That is, a "plaintiff must show that he or she acted upon the fraud

or misrepresentation complained of."  Id. at 258.

With these principles in mind, the Court finds that Counts III and IV are both

deficient.  In Count III, Plaintiff alleges that CCC, through Brett Elliot, misrepresented

the fact that Plaintiff would be compensated for the pork bellies it supplied.  (Am.

Compl., ¶ 43.)  These misrepresentations allegedly occurred "over the course of business

from August 2006 forward."  (Id.)  In this regard, Plaintiff has sufficiently identified who

made an alleged misrepresentation, its content, and when it was made.  However, this is

true only with respect to a fraud claim against Brett Elliot, and not the other Westin

Defendants.  There are no allegations concerning whether Westin, Inc., WPM, or Brad

Poppen made any misrepresentations.  Perhaps recognizing this, Plaintiff alleges that the

remaining Westin Defendants should be held liable under a corporate veil piercing theory.

(See id., ¶ 47.)  However, as discussed in section II.B.1.b., *supra*, of this Opinion,

Plaintiff has failed to state a claim for piercing the corporate veil.

Moreover, Count III is deficient as to all Westin Defendants, including Brett Elliot, because Plaintiff does not plead with particularity facts showing how it reasonably and detrimentally relied on the alleged misrepresentations.  In other words, the allegations do not show how Plaintiff acted on the alleged fraud.  Instead, it merely states in a conclusory fashion that it "reasonably and justifiably relied on the intentional misrepresentations," (Am. Compl., ¶ 45,) which is precisely the kind of generalized pleading Rule 9(b) prohibits, see Learning Works, 830 F.2d at 546 (dismissing a fraud claim wherein the plaintiff alleged it detrimentally relied on the defendant's misrepresentations by ceasing its business operations, but provided no factual allegations supporting a conclusion that this reliance was reasonable).

With respect to Count IV, Plaintiff frequently states throughout the Amended Complaint that the auction of CCC's assets was "fraudulent."  (See Am. Compl., ¶¶ 5, 6, 23, 26, 27, 28.)  However, Plaintiff does not provide the requisite specificity to satisfy Rule 9(b) with respect to its common law fraud claim.  For example, Plaintiff alleges that "misrepresentations and omissions were made intentionally and are material," (id., ¶ 50,) but fails to identify even generally the content of the misrepresentations of which it speaks.  For that matter, the Amended Complaint does not even allege that any specific defendant made any statement whatsoever to Plaintiff in connection with the auction.

Plaintiff attempts to rescue Count IV by arguing that it sufficiently alleged a material omission insomuch as it claims it "was never informed of the auction."  (Pl. Res.

25

Br. to LaSalle M., p. 5; <u>see</u> Pl. Compl., ¶ 24.)  However, this is a far cry from the kind of

specificity required by Rule 9(b).  As an initial matter, merely alleging that one was

"never informed" of a piece of information is not the same as alleging with particularity

that a *specific defendant intentionally omitted* that information.

Moreover, Plaintiff does not allege that any defendant owed it a duty to disclose

information about the auction.  "[W]here a claim for fraud is based on silence or

concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure

is necessary to make a previous statement true or the parties share a 'special

relationship.'"  <u>Lightning Lube v. Witco Corp.</u>, 4 F.3d 1153, 1185 (3d Cir. 1993)

(citations omitted); <u>see</u> <u>Berman v. Gurwicz</u>, 458 A.2d 1311, 1313 (N.J. Super. Ct. Ch.

Div. 1981).  There are only three types of relationships that give rise to a duty of

disclosure:

> (1) fiduciary relationships, such as principal and agent, client
> and attorney, or beneficiary and trustee; (2) relationships where
> one party expressly reposits trust in another party, or else from
> the circumstances, such trust necessarily is implied; and (3)
> relationships involving transactions so intrinsically fiduciary that
> a degree of trust and confidence is required to protect the
> parties.

<u>Lightning Lube</u>, 4 F.3d at 1185 (citing <u>Berman</u>, 458 A.2d at 1313).

Additionally, under section 9-611 of the Uniform Commercial Code ("U.C.C."), a

secured creditor, such as LaSalle, that intends to sell the collateral of a defaulting party is

required to provide notice to: (1) the debtor; (2) any secondary obligor; (3) any party that

provided the secured creditor with an authenticated notification of a claim of interest in the collateral; (4) any other secured party who holds a security interest in the collateral perfected by filing a financial statement; and (5) any other secured party who holds a security interest in the collateral perfected by compliance with a statute or regulation.  See 810 ILL. COMP. STAT. 5/9-611; N.J. STAT. ANN. § 12A:9-611.

In this case, the Amended Complaint does not allege the existence of any kind of "special relationship" between Plaintiff and any defendant.  Nor does it allege that Plaintiff was entitled to notice under the U.C.C.  Nonetheless, Plaintiff argues in its brief that it is entitled to notice because it perfected a security interest in CCC's assets when it delivered pork bellies in compliance with the PSA.  (See Pl. Res. Br. to LaSalle M, p. 5.) This argument fails, however, for two reasons.  First, Plaintiff cannot defeat a motion to dismiss by raising new allegations, like its entitlement to notice under the U.C.C., for the first time in its brief.  See Town of Secaucus v. United States Dep't of Transp., 889 F. Supp. 779, 791 (D.N.J. 1995) ("On a 12(b)(6) motion, the district court is limited to the facts alleged in the complaint, not those raised for the first time by counsel in its legal memorandum.").  Second, the Court has already determined that Plaintiff is not an unpaid cash seller of livestock and is therefore not a beneficiary of the PSA's statutory trust.  As such, Plaintiff cannot be said to have perfected a security interest as a trust beneficiary.

Furthermore, as with Count III, Plaintiff fails to plead with particularity facts in Count IV showing how it reasonably and detrimentally relied on the alleged fraud

27

connected with the auction.  Instead, it again states in a conclusory fashion that it "reasonably and justifiably rel[ied] on the intentional misrepresentations and omissions." (Pl. Am. Compl., ¶ 51.)  Such generalized statements are insufficient under Rule 9(b).

For these reasons, the Court concludes that Plaintiff has not sufficiently alleged the necessary elements to sustain a common law fraud claim against LaSalle or any Westin Defendant in either Count III or IV.  Accordingly, these counts will be dismissed for failure to state a viable claim.  However, the Court will order this dismissal without prejudice so that Plaintiff may attempt to cure its pleading defects.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1435 (indicating that where a complaint is dismissed for failure to plead fraud with particularity, leave to amend should typically be granted).

### 4.  Count V: Unjust Enrichment

In Count V, Plaintiff asserts a claim for unjust enrichment.  However, this claim must be dismissed as to LaSalle and each of the Westin Defendants.

"Under New Jersey law,[16] '[t]he constructive or quasi-contract is the formula by which enforcement is had of a duty to prevent unjust enrichment or unconscionable benefit or advantage.'"  Suburban Transfer Serv., Inc. v. Beech Holdings, Inc., 716 F.2d 220, 226 (3d Cir.1983) (quoting Borough of West Caldwell v. Borough of Caldwell, 138

---

[16]Both LaSalle and the Westin Defendants indicate that New Jersey law applies in considering their motions to dismiss the unjust enrichment claims, (LaSalle Br., p. 8 n.1; Westin Br., p. 25 n.7,) although LaSalle reserves the right to challenge the choice of law "should this case proceed beyond the pleading stage," (LaSalle Br., p. 8 n.1.)  Plaintiff raises no objection to this assertion.

A.2d 402, 412 (N.J. 1958)).  Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law.  Nat'l Amusements, Inc. v. N.J. Tpk. Auth., 619 A.2d 262, 267 (N.J. Super. Ct. Law Div. 1992).

To establish unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 554 (N.J. 1994).  However, a defendant will be liable only if the plaintiff shows that it "expected remuneration from the defendant at the time it . . . conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  Id.  It has been observed that quasi-contract claims involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit.  See Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 335 (N.J. Super. Ct. App. Div. 1966).

"Quasi-contract liability will not be imposed, however, if an express contract exists concerning the identical subject matter."  Suburban Transfer, 716 F.2d at 226-27; see also Duffy v. Charles Schwab & Co., 123 F. Supp. 2d 802, 814 (D.N.J. 2000) ("[R]ecovery based on a quasi-contract theory is mutually exclusive of a recovery based on a contract theory.").  "The authority of an express contract will take precedent over a theory of unjust enrichment or quasi-contract liability concerning the identical subject matter since '[t]he parties are bound by their agreement, and there is no ground for implying a promise so long as a valid unrescinded contract governs the rights of the parties.'"  Dovale v.

29

Marketsource, Inc., Civil No. 05-2872, 2006 U.S. Dist. LEXIS 57679, at *24 (D.N.J. Aug. 17, 2006) (quoting Suburban Transfer, 716 F.2d at 226-27).  Although litigants may plead alternative and inconsistent claims, Fed. R. Civ. P. 8(d)(2) & (3), courts have on numerous occasions dismissed under Rule 12(b)(6) unjust enrichment claims that relate to the same subject matter as valid contracts.  See, e.g., Estate of Gleiberman v. Hartford Life Ins. Co., 94 Fed. Appx. 944, 947 (3d Cir. 2004); Royale Luau Resort v. Kennedy Funding, Civil No. 07-1342, 2008 U.S. Dist. LEXIS 11902, at *30-31 (D.N.J. Feb. 19, 2008); Kohn v. Haymount Ltd. P'ship, LP (In re Int'l Benefits Group, Inc.), Civil No. 06-2363, 2007 U.S. Dist. LEXIS 46889, at *11 (D.N.J. June 28, 2007); Oswell v. Morgan Stanley Dean Witter & Co., Civil No. 06-5814, 2007 U.S. Dist. LEXIS 44315, at *29-30 (D.N.J. June 18, 2007).

With these principles in mind, the Court concludes that Count V fails to state a claim as to both LaSalle and the Westin Defendants.  The Amended Complaint alleges that "Defendants had a benefit conferred upon them by [Plaintiff] in that [Plaintiff] has completed its contractual obligations by shipping" certain pork bellies and preparing for shipment other pork bellies, the order for which was ultimately cancelled.  (Am. Compl., ¶ 54.)  Further, Plaintiff contends "[i]t would be inequitable for Defendants to enjoy the benefits of [these pork bellies] without [Plaintiff] receiving the contracted for compensation that it is owed."  (Id., ¶ 55.)  These allegations raise a number of problems.

Even if true, no allegation in Count V, or anywhere else in the Amended

Complaint, gives rise to an unjust enrichment claim against LaSalle.  Plaintiff nowhere alleges any facts from which the Court could reasonably infer any direct relationship between it and LaSalle, or that there was any mistake on its part in shipping, or preparing for shipment, the pork bellies at issue in this case.  Moreover, while Plaintiff argues that LaSalle was unjustly enriched because it kept the proceeds from the sale of CCC's assets for itself, (Pl. Res. Br. to LaSalle M., p. 6-7,) Plaintiff nowhere alleges that it conferred a benefit on LaSalle with an expectation of remuneration from LaSalle.  Finally, Plaintiff does not allege that LaSalle received any benefits, from any source, that exceeded its contractual rights.  Indeed, Plaintiff concedes that the proceeds LaSalle received from the sale of CCC's assets was "money [CCC] owed LaSalle . . . ."  (Id., p. 6.)  Thus, the Court must dismiss the unjust enrichment claim as to LaSalle.

The claim is also defective as to the Westin Defendants.  The only benefit allegedly conferred upon any defendant was Plaintiff's fulfillment of its "contractual obligations" to CCC.  (See Am. Compl., ¶ 54.)  To the extent that WPM can be held liable as a successor to CCC, this means there is no allegation that WPM was enriched beyond its contractual rights.  Likewise, Plaintiff's only allegation concerning whether this benefit's retention would be unjust is that Plaintiff has not received "the contracted for compensation that it is owed."  (See id., ¶ 55.)  Thus, it is clear that Plaintiff's unjust enrichment claim against WPM relates to the exact same subject matter as the sales agreements at issue in its breach of contract claim.  The unjust enrichment claim should

31

accordingly be dismissed as to WPM.

Additionally, the Court fails to see how Plaintiff's fulfillment of its contractual obligations to CCC amounts to a benefit conferred upon the other Westin Defendants, *to wit*, Westin, Inc., Brad Poppen, and Brett Elliot.  Even if it did, there are no allegations from which the Court could reasonably infer that Plaintiff had an expectation of remuneration from these defendants at the time it conferred the alleged benefit.  Nor are there any allegations suggesting that there was a direct relationship between Plaintiff and any of these defendants.  As such, the unjust enrichment claim must also be dismissed as to the remaining Westin Defendants.

### 5.  Count VI: Civil Conspiracy

In Count VI, Plaintiff alleges that, by agreeing to the so-called "friendly foreclosure," all defendants civilly conspired to "inflict a wrong against or injury upon Plaintiff . . . ."  (Pl. Compl., ¶ 59.)  Given the Court's dismissal of Plaintiff's fraud claims, however, Count VI will also be dismissed without prejudice.

Under New Jersey law,[17] "a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to

---

[17]Both LaSalle and the Westin Defendants indicate that New Jersey law applies in considering their motions to dismiss the civil conspiracy claim, (LaSalle Br., p. 8 n.1; see Westin Br., p. 27,) although LaSalle reserves the right to challenge the choice of law "should this case proceed beyond the pleading stage," (LaSalle Br., p. 8 n.1.)  Plaintiff raises no objection to this assetion.

inflict a wrong against or injury upon another, and an overt act that results in damage.'"

Banco Popular, 876 A.2d at 263 (quoting Morgan v. Union County Bd. of Chosen

Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)); see also Eli Lilly, 23 F.

Supp. 2d at 496.  The unlawful agreement need not be expressed and the participants need

not know all the details of the plan designed to achieve the objective.  Weil v. Express

Container Corp., 824 A.2d 174, 183 (N.J. super. Ct. App. Div. 2003).  Instead, "the

plaintiff must demonstrate that there was one plan and that its essential scope and nature

was known to each person who is charged with responsibility for its consequences."  Id.

     This Court further elaborated upon the nature of a civil conspiracy in Eli Lilly:

> A civil action for conspiracy is essentially a tort action.
> Therefore, to maintain an action for civil conspiracy, a plaintiff
> must also point to (1) an overt act of one or more of the
> conspirators in furtherance of the conspiracy; and (2)
> consequential damage to the rights of another, of which the
> overt act is the proximate cause. *[A p]laintiff cannot bring an
> action alleging civil conspiracy unless defendants committed an
> act which would be actionable even without the conspiracy.*
> Thus, "the conspiracy is not the gravamen of the charge, but
> merely a matter of aggravation, enabling the plaintiff to recover
> against all the defendants as joint tortfeasors." *The actionable
> element is the tort which the defendants agreed to perpetrate
> and which they actually committed.*

Eli Lilly, 23 F. Supp. 2d at 496-97 (emphasis added) (internal citations omitted).  Thus,

the dismissal of a plaintiff's independent tort claims requires the dismissal of any

corresponding conspiracy claims.  See Brown v. Philip Morris Inc., 228 F. Supp. 2d 506,

517 n.10 (D.N.J. 2002); Eli Lilly, 23 F. Supp. 2d at 497.

In this case, the only actionable tort allegedly committed by all defendants was common law fraud in connection with the auction of CCC's assets.  Because the Court has already dismissed Count IV, there no longer remains any underlying tort upon which to premise the civil conspiracy claim.  Therefore, the Court will dismiss Count VI as to LaSalle and each of the Westin Defendants.  This dismissal will be ordered without prejudice to the extent that Plaintiff cures the pleading defects in Count IV.

## III.  CONCLUSION

For the foregoing reasons, the Court will dismiss the Amended Complaint in its entirety as far as LaSalle is concerned.  However, as previously stated, this dismissal will be ordered without prejudice insomuch as Plaintiff may attempt to cure the defects in Counts IV and VI with respect to LaSalle.  Likewise, the Court will dismiss the Amended Complaint in its entirety as to Westin, Inc., Brad Poppen, and Brett Elliot.  It will also dismiss Counts II, III, IV, V, and VI, but not Count I, of the Amended Complaint as to WPM.  Again, the Court's dismissal of Counts III, IV, and VI will be ordered without prejudice as to each of the Westin Defendants.  Plaintiff may attempt to cure the pleading defects in Counts III, IV, and VI by filing a Second Amended Complain as directed in the accompanying Order.

 /s/ Joseph H. Rodriguez  
JOSEPH H. RODRIGUEZ  
United States District Judge

Dated: <u>March 17, 2008</u>

34